**SIGNED THIS: February 16, 2017**

_____

**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 16-70536 |
| PAUL B. HEFT, | ) | |
| | ) | Chapter 12 |
| Debtor. | ) | |

## O P I N I O N

Before the Court is the Debtor's Motion for Authority to Pay Secured Creditors Bank of Chestnut and Illinois National Bank. The motion asks that the Debtor be authorized to pay the two creditors directly and in contravention of the express terms of the Debtor's pending, but not yet confirmed, Second Amended Chapter 12 Plan. Because the motion is procedurally and substantively deficient, it will be denied.

## I. Factual and Procedural Background

Paul B. Heft ("Debtor") filed his voluntary petition under Chapter 12 on March 31, 2016. In his statement of financial affairs, the Debtor disclosed that, after harvesting and selling his 2015 crop, he had ceased farming. He stated that he intended to liquidate his remaining farm equipment and use the proceeds to pay creditors. On his Schedule A/B: Property, he listed a number of items of farm equipment valued in the aggregate at $73,850. On his Schedule D: Creditors Who Have Claims Secured by Property, he stated that the Bank of Chestnut had a lien on the farm equipment in the amount of $18,370, and that Illinois National Bank had a lien on the equipment and on other collateral to secure a debt of $30,000.

The Debtor timely filed his Chapter 12 Plan ("Plan"), which proposed that the Chapter 12 Trustee ("Trustee") would pay the Bank of Chestnut and Illinois National Bank from the proceeds of the sale of the Debtor's equipment. No projected amount of the proposed payments nor any interest rate to be used in the calculation of the payments was suggested; no details of how or when the equipment would be sold were disclosed. The Plan also proposed that the Trustee would distribute any surplus proceeds from the sale to unsecured creditors along with the Debtor's disposable income for a period of three years. No information was included in the Plan, however, about how disposable income would be calculated or when either that income or the sale proceeds would be paid to the Trustee for distribution to creditors.

At a confirmation hearing on the Plan held in July 2016, the Debtor's attorney reported that no objections to the Plan had been filed and that he believed the Plan should be confirmed. The Court questioned what appeared to be

inconsistencies in the Plan regarding the payment of income taxes related to the equipment sale, and the Debtor's attorney conceded that the potential tax consequences of the sale had not been fully considered and that a provision for the payment of those taxes was needed. He acknowledged that providing for such taxes to be paid from the sale proceeds would benefit the Debtor and should have been included in the Plan.

The Court also questioned how the Plan could be implemented when it contained virtually no details regarding the Debtor's obligations under it. The Court asked how anyone—the Trustee, creditors, or the Court—could ever determine whether the Debtor was in default under the Plan when it contained no dates by which the Debtor was required to do anything, no ongoing obligation on the part of the Debtor to account to the Trustee or creditors, and no formula by which disposable income was to be calculated. After discussing these issues at length, the Debtor's attorney acknowledged, albeit reluctantly, that providing significantly more details of the what, when, and how of the Debtor's proposed Plan would be beneficial. At the conclusion of the hearing, confirmation of the Plan was denied and the Debtor was given time to file an amended plan.

The Debtor's First Amended Plan was filed September 22, 2016. The First Amended Plan provided a deadline for the equipment sale and required the Debtor to file a report of sale within 30 days of the sale. The report of sale was required to contain information about the tax consequences of the sale and a proposed amount to be held by the Debtor from the sale proceeds to pay such taxes. In the First Amended Plan, the Debtor proposed to turnover to the Trustee all net sale proceeds after the payment of sale expenses and the deduction of the tax holdback

within 14 days after sending the report of sale to all creditors.

The First Amended Plan also provided for a minimum disposable income payment to the Trustee of $200 per month for 36 months and for an ongoing obligation of the Debtor to provide tax and financial information to the Trustee annually. Procedures were established in the First Amended Plan for questions or objections to be raised by the Trustee or creditors to the Debtor's annual disclosures.

The treatment of the Bank of Chestnut and Illinois National Bank under the First Amended Plan remained similar to that under the original Plan. Both were proposed to be paid by the Trustee from the equipment sale proceeds. No principal amount due nor rate of interest related to the Debtor's obligation to either creditor was stated in the First Amended Plan.

At the confirmation hearing on the First Amended Plan, the Debtor's attorney reported that the Debtor had recently, and unexpectedly, received $31,000 in government dividend checks related to prior crop years. He stated that he had discussed how the funds should be distributed with the Trustee and believed that another amended plan would be needed to address the disposition of the funds. Accordingly, confirmation of the First Amended Plan was denied and the Debtor was given two weeks to file another amended plan.

The Debtor filed a Second Amended Plan that provided that the recently received funds would be used to pay the income taxes incurred for the 2016 sales, thereby reducing the amount to be held back from the equipment sale proceeds for the payment of such taxes. The Second Amended Plan also provided more detail regarding the standards by which the Debtor's disposable income would be

calculated. The treatment of the Bank of Chestnut and Illinois National Bank was unchanged from prior plans, but the Second Amended Plan did change the deadline for filing the report of sale of the equipment from 30 to 45 days.

While the Debtor was working through the changes in his several plans, he was also proceeding with the equipment sale. He obtained authority to hire Martin Auction Services and he filed both a motion to sell the equipment free and clear of liens and a notice of intent to sell the equipment at public auction. The motion to sell free and clear recited that the Debtor believed that both the Bank of Chestnut and Illinois National Bank had liens on the equipment, but it did not identify the amounts of any such liens and it specifically requested that any such liens attach to the sale proceeds with the validity and priority of the liens to be determined at a later date. All creditors and parties in interest received notice of their opportunity to object to the motion to sell free and clear and the proposed auction. In the absence of any objection, the Debtor was authorized to conduct an auction on November 19, 2016, and to sell the equipment free and clear of any liens of the Bank of Chestnut or Illinois National Bank.

A confirmation hearing on the Second Amended Plan was held November 29, 2016. The Debtor's attorney reported that the auction of the Debtor's equipment had been successfully completed. He stated that he had received no objections to the Second Amended Plan and that it should be confirmed. The Trustee, represented by counsel at the hearing, agreed that the Second Amended Plan should be confirmed. The Court agreed that the Second Amended Plan could be confirmed but questioned whether it could be fully implemented as proposed because the Bank of Chestnut had not filed a claim and the deadline to file claims

had long since passed. The Court suggested that the issue of the unfiled claim be mentioned in the confirmation order to memorialize the fact that the Debtor and the Trustee were aware of the problem before confirmation and to clarify that confirmation of the Second Amended Plan did not serve to authorize payment to the Bank of Chestnut when no claim had been filed. The Trustee's attorney agreed that the debt to the Bank of Chestnut could not be paid absent the filing of a claim.

The Debtor and his attorney expressed surprise about the unfiled claim and concern about the prospect of the Bank of Chestnut not getting paid. The Debtor's attorney initially suggested that he would just pay the Bank of Chestnut from the funds he was holding from the equipment sale before turning the balance over to the Trustee. The Court questioned whether the Debtor could unilaterally decide to divert proceeds from the sale to a creditor when neither the pending Second Amended Plan nor the sale order contemplated or authorized such a payment. After further discussion of the issue, the Debtor's attorney agreed that he would not take any action on behalf of the Bank of Chestnut but requested that the confirmation hearing be continued so that he could notify the Bank's president directly about the problem. The confirmation hearing was continued to January 10, 2017.

Approximately two weeks after the hearing, the Debtor filed his report of sale regarding the auction of his equipment. The report of sale disclosed gross proceeds received of $70,150 and auctioneer fees and expenses incurred of $4689.50. The report did not suggest that any amount be held back by the Debtor for income taxes, but the report was sent to all creditors and parties in interest.

In a footnote, the report of sale said that the liens of the Bank of Chestnut and Illinois National Bank had attached to the sale proceeds and that a motion to pay those liens would be filed.

A day later, the Debtor filed his motion seeking authority to pay the Bank of Chestnut and Illinois National Bank. In the motion, the Debtor stated that the Bank of Chestnut is owed $12,936.31 plus $2.12 in interest for every day after December 2, 2016, and that Illinois National Bank is owed $29,640.87 plus $4.47 in interest for each day after December 2, 2016. The Debtor also filed a memorandum of law with his motion. In the memorandum, the Debtor asserted that the Court's reliance on *In re Pajian*, 785 F.3d 1161 (7th Cir. 2015), for the proposition that the Trustee cannot pay the Bank of Chestnut in the absence of a timely filed claim, was misplaced. Rather, the Debtor argued that this Court should follow *In re Hrubec*, 544 B.R. 397 (Bankr. N.D. Ill. 2016), and find that secured creditors are not required to file a claim in order to receive distributions under a plan so long as the debtor does not object to the payment being made.

Hearing on the Debtor's motion seeking authority to make the payments was set with the confirmation hearing previously scheduled for January 10th. Prior to that date, nothing was filed by the Bank of Chestnut. No one from or on behalf of the Bank of Chestnut appeared at the hearing. The Debtor's attorney reported that he had notified the president of the Bank of Chestnut about the problem with the unfiled claim. He had also spoken about the issues with an attorney representing the Bank. He said that he did not know why no one from the Bank of Chestnut was present but assumed it was because he had told the Bank's attorney that he was going to file the motion seeking authority to make the

- 7 -

payments and, perhaps, the Bank's attorney was expecting the Debtor's attorney to solve the Bank's problem.

In support of the motion, the Debtor's attorney first argued that the previously granted sale motion and the Debtor's successive plans had all contemplated that the Debtor would pay the Bank of Chestnut and Illinois National Bank directly from the equipment sale proceeds. After the attorney for the Trustee pointed out the express provisions in the Second Amended Plan directing the Trustee to make the payments, and the Court stated that none of the previously filed documents had ever called for direct payments, the Debtor's attorney argued that he could have proposed in the sale motion and the several plans that the secured creditors were to be paid directly and not by the Trustee. He also asserted that he could seek to file yet another amended plan to provide for direct payment, although he volunteered that he expected that such a request would raise questions of the Debtor's good faith. He also stated that the Debtor might voluntarily dismiss his case if his motion were denied.

Finally, the Debtor's attorney argued, as he had in his memorandum of law, that the reliance by the Court and the Trustee on *Pajian*, for the proposition that a proof of claim needed to be filed in order for the Bank of Chestnut to receive the payment proposed in the Second Amended Plan, was misplaced. He argued, relying on *Hrubec*, that a proof of claim was not required to be filed in order for the Bank of Chestnut to be paid. The Trustee's attorney countered that *Pajian* controls the outcome here and that following *Hrubec* would make the administration of Chapter 12 and, more importantly, Chapter 13 cases difficult.

The issues have been fully briefed and argued. The matter is ready for

decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Issues relating to the administration of the estate, the allowance and disallowance of claims, the confirmation of plans, and the adjustment of the debtor-creditor relationship are all core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (L), and (O). The issues here arise directly from the Debtor's bankruptcy and from the provisions of the Bankruptcy Code, and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

*A. The Debtor's motion seeking authority to pay the Bank of Chestnut and Illinois National Bank is procedurally deficient.*

The Debtor's motion seeking authority to pay the Bank of Chestnut and Illinois National Bank is not based on any provision of the Bankruptcy Code or Rules and the Debtor has cited no statute or case law in support of his request for this Court to authorize the payments he wants to make. His request comes essentially "out of the blue" and is in contravention of the framework for paying creditors that he has advanced consistently throughout the case. The Debtor asks for the relief because he hit a stumbling block in the expected implementation of his proposed Second Amended Plan and he wants the impediment removed so

that he can get on with what he wants to do, regardless of the constraints of controlling law.

The Debtor's successive plans have all provided for the equipment sale proceeds to be turned over to the Trustee and for the Trustee to make the payments to the Bank of Chestnut and Illinois National Bank. The Second Amended Plan was ready for confirmation at the hearing in November 2016 and it remains confirmable. If the Debtor's motion were granted, however, the Debtor would disburse the sale proceeds directly to the creditors, thereby rendering the provisions of the Second Amended Plan that address the payment of those creditors by the Trustee meaningless. If the direct payments were authorized and paid, the Second Amended Plan would no longer be confirmable and the Court would have to either grant the Debtor an opportunity to file another amended plan or dismiss the case.

Chapter 12 debtors must file a plan within 90 days of the case filing and that deadline should only be extended "if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable." 11 U.S.C. §1221. Chapter 12 confirmation hearings are to be expedited and should be concluded within 45 days. 11 U.S.C. §1224. Here, although it was timely filed, the Debtor's original Plan was not confirmable. The Plan was severely lacking in detail and provided no deadlines for the Debtor to complete his obligations. These failings were wholly attributable to the Debtor. Nevertheless, the Debtor was granted time to file an amended plan. The Debtor's First Amended Plan was a significant improvement over the original Plan but needed to be further amended when the Debtor received some unexpected funds. The Debtor's Second Amended

Plan has been ready for confirmation since November 2016, but the Debtor has put off confirmation twice, solely for the purpose of trying to fix the problems caused by the Bank of Chestnut's failure to file a claim.

The Debtor's attorney candidly suggested at the January 10th hearing that a request by the Debtor for leave to file yet another amended plan might raise issues of good faith. Such a request would also be tested by whether the circumstances necessitating the requested extension of time were attributable to the Debtor. The Debtor's decision to change course and pay creditors directly, after filing three successive plans providing for the Trustee to pay those creditors, would clearly be attributable to the Debtor. As the Debtor's attorney has acknowledged, a direct request by the Debtor for leave to file another amended plan would not likely be granted under the circumstances presented here. An indirect request made by seeking relief contrary to plan terms, which if granted would necessitate an amended plan, should not be granted either.

Interestingly, at the January 10th hearing, the Debtor's attorney also complained that Illinois National Bank was being unfairly delayed in receiving the monies due to it. But the delay is attributable to the Debtor's requests that the confirmation hearing be twice continued and his insistence that a remedy be crafted for the Bank of Chestnut, despite the Bank's failure to file a claim or take any action on its own behalf. Illinois National Bank timely filed its claim and, if the Second Amended Plan is confirmed and the Debtor turns over the sale proceeds as proposed, Illinois National Bank will be paid promptly. The motion to pay was not needed in order to get Illinois National Bank paid, and the unfortunate delay experienced by Illinois National Bank in getting paid does not

justify granting the motion.

After the Trustee's attorney pointed out that the Second Amended Plan provided for the Trustee—and not the Debtor—to pay the Bank of Chestnut and Illinois National Bank, the Debtor's attorney argued that the motion should still be granted because the Debtor could have filed a plan providing for the direct payment of these creditors. Further, he asserted that the Debtor also could have provided in his sale motion for direct payments at the time of the sale to the creditors.[1] But it is equally true that the Bank of Chestnut could have filed a timely claim or the Debtor could have filed a claim on the Bank's behalf when it failed to file its own claim. 11 U.S.C. §501; Fed. R. Bank. P. 3004. What could have happened but did not happen, however, does not control what happens now. The Debtor and his attorney made choices about how to proceed throughout the case and those choices control the result here. The fact that different choices might have led to a different result is irrelevant.

The Debtor's attorney also said at the January 10th hearing that the Debtor may dismiss his case if his motion is denied. He says that if the Debtor dismisses, he will then have full control of the sale proceeds and can make the payments he wants to make. That may well be true, and, if it is in the best interest of the

---

[1] In making this argument, the Debtor's attorney assumes that, had a different motion been filed and a different plan been proposed, the motion would have been granted and the plan confirmed without objection or question. But that is not necessarily the case. Had the Debtor sought in his sale motion to pay the creditors directly from the sales proceeds, the Trustee might well have asked for pay-off information and supporting documentation of the creditors' liens—the exact information required to be included in a proof of claim. Because the Bank of Chestnut has never provided any of that information, this Court cannot just assume that no issues would have arisen if different documents had been filed by the Debtor.

Debtor to dismiss, so be it. But the threat of dismissal adds nothing to the analysis of whether the motion is supported by legal authority and should be granted.

The Debtor has never provided authority for the Court to consider the motion seeking to pay creditors in contravention of the express terms of the pending Second Amended Plan. As the Court noted at the hearing, the motion here is not the typical request for authority to make a payment that is frequently presented. For example, requests to pay professional compensation or administrative expenses, which are supported by specific statutory authority, are routine matters. *See* 11 U.S.C. §§330(a)(1), 503. But here, no provision of the Code is implicated in seeking the authority to make the requested payments and the obvious intent of the motion is to undercut the express terms of the pending Second Amended Plan. For these reasons, the motion must be denied.

### B. The Bank of Chestnut cannot be paid by the Trustee through the Second Amended Plan due to its failure to file a claim.

The Debtor's motion seeks authority to pay the Bank of Chestnut directly, but it is doubtful that the Debtor really cares whether the Bank of Chestnut is paid directly or by the Trustee through the Second Amended Plan. The Debtor just wants the Bank of Chestnut to get paid. The Bank's failure to file a claim, however, is an impediment to payment by the Trustee and it is for that reason that the motion was brought. As explained above, the Debtor's motion is procedurally deficient, but it did serve to bring before the Court the substantive issue of whether the lack of a timely filed claim means that the Bank of Chestnut cannot

-13-

be paid by the Trustee.

In suggesting at the November 2016 confirmation hearing that the Bank of Chestnut's failure to file a claim was problematic, this Court was relying on the Seventh Circuit's decision in *Pajian*, which held that "[a] creditor must file a proof of claim in order to participate in Chapter 13 plan distributions." *Pajian*, 785 F.3d at 1163. Because *Pajian* relied on rules that apply in both Chapter 12 and Chapter 13 cases, the Bank of Chestnut was clearly subject to *Pajian*'s further holding that all creditors must timely file claims because "all creditors—unsecured and secured alike—are bound by the Rule 3002(c) deadline." *Id.* at 1164; *see* Fed. R. Bankr. P. 3002(a), (c), 3021. *Pajian* unequivocally requires that if a secured creditor is to participate in Chapter 13 plan distributions, a proof of claim must be filed. *Pajian*, 785 F.3d at 1165. Because the same rules apply, the same holds true in this Chapter 12 case.

Notwithstanding *Pajian*, the Debtor argues that secured creditors are not required to file claims in order to participate in plan distributions. The Debtor relies on *Hrubec*, a bankruptcy court decision, which held that "when a debtor voluntarily proposes a plan that includes payments to a secured creditor, and that creditor has no objection to its treatment under the proposed plan, there is no need for the creditor to file a proof of claim[.]" *Hrubec*, 544 B.R. at 401. *Hrubec* makes the finding that no claim is required if a debtor does not object, even though it also says, relying on *Pajian*, that "if a secured creditor wants to ensure participation in a debtor's plan . . . it must file a proof of claim in a timely manner." *Id. Hrubec* essentially says that whether a claim is paid through a plan is up to the debtor; if a debtor says a debt is to paid, then the trustee must pay

-14-

it regardless of compliance with the rules and case law that would otherwise make the timely filing of a claim a prerequisite to receiving plan payments.

To reach its conclusion that secured creditors do not have to file claims in order to share in plan distributions, *Hrubec* distinguishes *Pajian* by saying that the statement in *Pajian* that claims must be filed for creditors to receive plan distributions was dictum and that the *Pajian* decision was about claims and not plans. *Hrubec*, 544 B.R. at 398-99. Neither assertion is persuasive in considering whether to disregard the clear language of *Pajian*.

Dictum has been defined as "any statement made by a court for use in argument, illustration, analogy, or suggestion . . . concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (citation omitted). Generally, courts are free to reject dicta found in otherwise precedential opinions because passages in opinions that are dicta have not been "refined by the fires of adversary presentation." *Id.* at 293. By calling key language in *Pajian* dictum, the *Hrubec* court freed itself from being bound by that language. But an analysis of *Pajian* reveals that the key language was not dictum.

In *Pajian*, a secured creditor filed a claim after the deadline imposed by Rule 3002(c). *Pajian*, 785 F.3d at 1162; Fed. R. Bankr. P. 3002(c). The Chapter 13 debtor objected to the claim as tardily filed, asserting that the claim was "barred from inclusion" in his Chapter 13 plan because it was late-filed. *Pajian*, 785 F.3d at 1162. In reaching its decision, the Seventh Circuit closely analyzed the Chapter 13 process and specifically found that distributions in Chapter 13 cases are to be made only to creditors "whose claims have been allowed." *Id.* at 1163; Fed. R.

Bankr. P. 3021. Claims, in turn, are "deemed allowed" when a proof of claim is filed. *Pajian,* 785 F.3d at 1163; 11 U.S.C. §§501, 502(a). Because only allowed claims are paid through Chapter 13 plans, *Pajian* held that the deadline for filing claims must apply to all creditors who want to be paid through a plan. *Pajian*, 785 F.3d at 1164.

Thus the conclusion in *Pajian* that the secured creditor had to timely file a claim in order to be paid was key to the decision and cannot be ignored as dictum. But it is also important to note that *Paijian* was not the first case in which the Seventh Circuit addressed the interplay between claims and plans. *See Matter of Greenig*, 152 F.3d 631, 636 (7th Cir. 1998). In *Greenig*, the argument relied on by *Hrubec*, that confirmation of a plan binds all parties and therefore obligates the trustee to pay creditors provided for in the plan regardless of whether a claim has been filed, was flatly rejected. *Id.* at 635. *Greenig* makes clear that amounts proposed to be paid to creditors through a plan may be estimates and are finalized only through the claims process. *Id.* In other words, the terms of a plan cannot be used to obviate the requirement that a proof of claim must be filed in order for creditors to be paid. *Id.* at 636.

Although *Greenig* involved an unsecured creditor*,* its holding is equally applicable to secured creditors. Analyzing *Greenig* in just such terms, a bankruptcy court held pre-*Pajian* that secured creditors must timely file a proof of claim in order to receive distributions under a confirmed plan, noting that, although the consequences of failing to file a proof of claim may be different for secured and unsecured creditors, the binding nature of a confirmation order is the same for all creditors. *In re Baldridge*, 232 B.R. 394, 395-96 (Bankr. N.D. Ind.

1999) ("if a specific provision in a debtor's confirmed plan, giving a particular creditor an allowed claim, to be paid a stated sum upon a particular schedule, is not sufficient to permit an unsecured creditor to receive that distribution, unless it also has an allowed proof of claim, there is no reason that a similar provision addressing a secured creditor should suffice, unless it too filed a proof of claim").[2]

*Hrubec*'s finding that *Pajian* does not compel the timely filing of claims by secured creditors who want to receive plan distributions does not hold up under scrutiny. *Pajian* addresses the relationship between the filing of claims and the distribution of plan payments. Thus, the language regarding the requirement that a claim be filed in order for a creditor to be paid through a Chapter 13 plan was essential to the decision, was the direct focus of the dispute, and was the actual matter adjudicated. The language from *Pajian* that *Hrubec* says may be disregarded as dictum was not dictum.

Even if the *Hrubec* analysis were more persuasive, there are several practical reasons for not following its holding and for not allowing debtors to direct trustees to pay creditors in the absence of a filed claim. The rules involved in the *Hrubec* and *Pajian* decisions apply to both Chapter 12 and Chapter 13 cases. Although the matter to be decided here arises in a Chapter 12 case, any holding would also

---

[2] To reach its contrary conclusion, *Hrubec* relies on the reasoning of two bankruptcy court decisions from outside this Circuit that it states were "cited with approval" in *Pajian*. *Hrubec*, 544 B.R. at 399-400 (discussing *In re Dumain*, 492 B.R. 140 (Bankr. S.D.N.Y. 2013), and *In re Dennis*, 230 B.R. 244 (Bankr. D.N.J. 1999)). But *Pajian*'s reference to *Dennis* and *Dumain* is neither favorable nor unfavorable; the cases were merely cited to illustrate the conflict among courts as to whether the Rule 3002(c) deadline applies to all creditors. *Pajian*, 785 F.3d at 1163-64. More importantly, however, neither *Dennis* nor *Dumain* discussed *Greenig* or considered the full impact of Rule 3021 on the issue.

impact Chapter 13 practice before this Court. As the Trustee's attorney asserted, administering Chapter 13 cases under *Hrubec*'s holding would be highly problematic.

Both Chapter 12 and Chapter 13 trustees have a duty "to examine proofs of claims and object to the allowance of any claim that is improper" if a purpose would be served by doing so. 11 U.S.C. §§704(a)(5), 1202(b)(1), 1302(b)(1). But if creditors can get paid by agreement with a debtor and without filing a claim, trustees will no longer be able to perform that duty.

It is not unusual, at least in this Court's anecdotal experience, that a debtor will propose to pay a creditor as secured only to find out by examining documents attached to a proof of claim that the creditor failed to record its mortgage, properly process its lien on a vehicle, or otherwise perfect its lien. Frequently, it is only through the claim process that such defects are discovered. Relieving some creditors of the obligation to file a claim and cutting the trustees out of the important claims review process would be damaging to the integrity of the bankruptcy system and would serve no good purpose.[3] *See In re Brown*, 559 B.R. 704, 710 (Bankr. N.D. Ind. 2016); *In re Schaffer*, 173 B.R. 393, 398 (Bankr. N.D.

---

[3] *Hrubec* says that its holding applies when the "creditor has no objection to its treatment under the proposed plan[.]" *Hrubec*, 544 B.R. at 401. But is silence the equivalent of no objection? And what if, as is the case here, the plan itself is silent about the principal amount, interest rate, and other terms of the proposed payment of the creditor? Under *Hrubec*, may a trustee ask the creditor for an affirmative statement of its lack of objection? In other words, may the trustee ask for a written statement of what is due to the creditor that is similar to a proof of claim? Or must the trustee just pay whatever creditors a debtor directs regardless of any questions or concerns the trustee may have? The practical problems for trustees administering plans under *Hrubec* are numerous and *Hrubec* provides no guidance on how those problems might be addressed.

Ill. 1994).

Likewise, in Chapter 13 cases, holders of claims secured by debtors' principal places of residence are subject to special requirements. Fed. R. Bankr. P. 3002.1. Chapter 13 trustees are required, upon the completion of a debtor's payments under a plan, to issue a notice to a mortgage holder that a debtor has cured any default on the mortgage claim. Fed. R. Bankr. P. 3002.1(f). But if the holder of a mortgage arrearage claim is not required to actually file a claim confirming the amount due to cure a default, how could the trustee competently prepare a notice that the arrearage has been cured? The procedures set forth in Rule 3002.1 serve the purpose of making sure that when a plan is completed, a debtor knows that his mortgage default has been cured. Removing the incentive for creditors to be part of the process by eliminating the requirement of filing a claim in order to get paid, makes little sense and, again, serves no good purpose. And, of course, as set forth above, it is contrary to the holding of *Pajian*.

Another bankruptcy court has followed *Hrubec*, recently holding that when both the creditor and debtor fail to file a claim for the creditor, the trustee must nevertheless pay to the creditor the amounts provided to be paid on its secured debt in a confirmed Chapter 13 plan. *See In re Kitzerow*, 2017 WL 499886, at *4 (Bankr. W.D. Wis. Feb. 7, 2017). *Kitzerow* relies on §1326(a)(2), which provides that, upon confirmation, "the trustee shall distribute" payments received from a debtor "in accordance with the plan[.]" *Id.* at *2; 11 U.S.C. §1326(a)(2). *Kitzerow* suggests that the provision "commands" the trustee to make payments according to a confirmed plan without regard to whether claims have been filed. *Kitzerow*, 2017 WL 499886, at *3. But §1326(a)(2) is a provision that controls the timing of

when a trustee may make plan disbursements; read as a whole, the provision requires a trustee to retain funds before confirmation and then disburse the funds, either to creditors or back to the debtor, upon confirmation or dismissal. 11 U.S.C. §1326(a)(2); *see generally* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4th Edition, §402.1, Sec. Rev. July 3, 2007, www.Ch13online.com. Section 1326(a)(2) has nothing to do with whether a creditor must file a claim in order to be paid through a plan.

*Kitzerow* also attempts to distinguish *Pajian* by saying that it only dealt with the problems caused by late-filed claims and did not address "the potentially disruptive effect" that the failure to file a secured claim might have on plan administration or the "potential for abuse that refusing to file such a claim could have." *Kitzerow,* 2017 WL 499886, at *4. But *Kitzerow* fails to explain how the "disruptive effect" that the failure to file a claim might have on plan administration is remedied by allowing the creditor to be paid despite not having a claim on file. And *Kitzerow* fails to explain how the refusal to file a claim could be considered abuse when creditors have no duty to file claims and debtors have the absolute right to file claims for creditors. 11 U.S.C. §501; Fed. R. Bankr. P. 3004.

Both *Hrubec* and *Kitzerow* provide remedies for problems that should not have occurred. When the creditors that the *Hrubec* and *Kitzerow* debtors wanted to pay failed to timely file claims, the debtors could have filed claims for those creditors. *Id.* But both debtors missed their deadlines. There is no potential for abuse by a creditor who refuses to file a claim because, contrary to the suggestion in *Kitzerow*, a debtor may always file a claim for a creditor. *Id.* Debtors and their attorneys should be reviewing claims when bar dates run and filing claims as they

deem appropriate to facilitate the payment of the creditors they want to pay. When they fail to do so, they may—and should—bear the consequences. *See Baldridge*, 232 B.R. at 396 ("[n]o one is ever required to file a proof of claim in any bankruptcy proceeding; it is just that not doing so has consequences"). Debtors have a remedy when creditors fail to file a claim; creating the troublesome remedy set forth in *Hrubec* and *Kitzerow* was unnecessary.

The Debtor acknowledges that he could have filed a claim for the Bank of Chestnut but did not do so. Both the Bank and the Debtor missed clearly set deadlines. This Court will not follow *Hrubec* and fashion a remedy that would, most certainly, negatively impact both Chapter 12 and Chapter 13 practice in this District.

## IV. Conclusion

Both the Bank of Chestnut and the Debtor missed their respective deadlines to file a claim to ensure that the Bank could be paid through the Debtor's Second Amended Plan. Under *Pajian*, the lack of a timely filed claim means that the Trustee will not pay the Bank of Chestnut, even if the Second Amended Plan, which provides for payment to the Bank, is confirmed. The Bank has not come forward to seek any relief from this result, despite apparently having been expressly apprised of the problem by the Debtor's attorney.

As the Court stated at the January 10th hearing, the Bank of Chestnut may actually not yet be "out of the money" here, but it is up to the Bank to make that case. The Debtor must move on and stop delaying confirmation of his Second Amended Plan if he wants to get any plan confirmed in this case. For the reasons

set forth above, the Debtor's motion will be denied and the Second Amended Plan will be set for one final confirmation hearing, at which time the Debtor will be required to proceed to confirmation or risk dismissal of his case. *See* 11 U.S.C. §1208(c)(1).

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###